

# NUMBER 13-24-00433-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF S.D.G. A/K/A S.D.R.S.G., A CHILD

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice West**

J.L.G. (Mother) appeals a judgment terminating her parental rights to her child S.D.G. a/k/a S.D.R.S.G.[1] By two issues, which we reorder, Mother argues that (1) there was legally and factually insufficient evidence that termination was in the child's best interest, and (2) she is entitled to a new trial because the trial court did not render its final

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents and children are referred to by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d).

order within ninety days of the date that trial commenced pursuant to § 263.4011 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 263.4011. We affirm.

## I.    BACKGROUND

Appellee, the Department of Family and Protective Services (the Department), filed a petition seeking to terminate Mother's parental rights to S.D.G., who was nine years old at the time of trial. The petition was accompanied by an affidavit alleging neglectful supervision by Mother. According to the affidavit, Mother and alleged father B.B. smoked crack cocaine in the direct presence of S.D.G.; there was ongoing domestic violence in the household; the couple left S.D.G. "alone and unsupervised for hours at a time, past midnight, almost every day"; S.D.G. was not enrolled in school; S.D.G. was "observed to be unclean as if she [wa]s not bathing, [and] always barefoot[]"; S.D.G. was asking neighbors for food and appeared malnourished; and S.D.G. outcried in a text to a neighbor that B.B. "was trying to have sex with [her] at night[]."

The affidavit included Mother's history with the Department. It received four reports of neglectful supervision of S.D.G. in 2014, 2016, 2018, and 2020. S.D.G. was removed from Mother's care upon birth in 2014, but she was returned after Mother "completed services to address substance abuse." Mother also has a history with family and protective services in California, where her five other children were removed from her custody. The trial court awarded the Department temporary managing conservatorship of S.D.G., and the case proceeded to a bench trial.

Evidence at trial established that a service plan was created for Mother and adopted by the trial court on August 24, 2022. The court ordered Mother to comply with the service plan, which required her to: (1) actively seek employment and provide the

2

Department with employment applications; (2) demonstrate that she can provide S.D.G. suitable housing and a stable living environment; (3) participate and complete parenting classes; (4) attend Alcoholic and Narcotics Anonymous; (5) participate in and complete individual counseling; (6) complete a psychological evaluation; (7) contact Mental Health and Intellectual Disabilities (MHID) to address any mental health diagnoses she has; (8) submit to random drug tests at the Department's request; (9) participate in an OSAR (Outreach, Screening, Assessment and Referral) assessment; (10) participate and attend classes about domestic violence; (11) maintain contact with the Department and notify the Department of any changes to her employment or housing situation; and (12) allow the Department access to her residence.

According to Denise Ramos, a specialist with the Department assigned to Mother's case, Mother did not complete any of the required services between August 2022 and August 2023. And in general, besides submitting three hair follicle drug tests, which came back positive for methamphetamine and marijuana, Mother did not cooperate with the Department in executing the service plan. Ramos made multiple attempts to contact Mother, including calling her and B.B., visiting their residence, and mailing copies of the service plan to their address. Ramos testified that Mother "had declared herself a sovereign citizen," "did not believe that [the Department] was a government agency," and refused to talk to or meet with her. Ramos lost all contact with Mother around September 2022 and did not meet with Mother about the service plan until a year later.

Ramos testified Mother progressed after their meeting in September 2023. She regularly attended the Department's randomized drug tests and all her results after August 2023 were negative. Another hair follicle drug test, conducted prior to trial, came

3

back negative. Mother completed the psychological evaluation and OSAR assessment, attended a weekly counseling session for "parenting, substance abuse, and individual therapy," and attended weekly NA/AA meetings.

Despite Mother's progress, Ramos testified that the Department was recommending termination of Mother's parental rights "[d]ue to her lack of cooperation and participation in the services to regain custody of [S.D.G.]." Ramos stated that Mother missed her counseling sessions for November and the second week of December, and thus, Mother had only completed five weeks of counseling by the time of trial. Ramos also testified that the Department was concerned for potential sexual abuse of S.D.G. by B.B. and domestic violence by B.B. against Mother, yet Mother married B.B. and moved into a home with him during the pendency of the case.[2] When visiting the couple's new residence, Ramos testified that "at least three to four" adult men were living in the home, and B.B. allegedly informed her that the home "was somewhat of a halfway house for individuals who had just been released from jail."

As to S.D.G.'s progress, Ramos testified that S.D.G. was currently in a foster home and was doing well. S.D.G. had enrolled in school and was participating in choir, baseball and volleyball, and was making As and Bs. She explained that S.D.G. has "changed significantly" since the start of the case and has become "a lot more outgoing, more talkative, more friendly, compassionate," and "more open." The Department's permanency plan was for S.D.G. to be placed with one of her biological siblings in Alabama. She explained that the family in Alabama had already adopted one of S.D.G.'s

---

[2] These allegations were not addressed in Mother's testimony.

4

siblings, wishes to adopt S.D.G. as well, and is now a licensed placement with the Department.

Mother denied the Department's allegations of neglect. She testified that S.D.G. was well taken care of, she was never left alone, and she never asked her neighbors for food. Mother testified that S.D.G. was not enrolled in school because she was homeschooled, and she had all the curriculum materials required under Texas law. As to her missed counseling sessions, Mother contended that she does not have reliable transportation and she often uses a Medicaid or public transportation service, which requires scheduling pick up and drop off "24 to 48 hours in advance." Mother testified that the service does not run on holidays, and the only counseling sessions she missed were because her appointments fell on holidays or her counselor was out on vacation. She also testified that the adult men living in the home were her roommates, and they were not former felons.

Now thirty-nine years old, Mother testified that she began using methamphetamines in her twenties. She contended, however, that she moved from California many years ago "to get away from that lifestyle." She denied ever using methamphetamines in front of her daughter and the hair follicle drug tests in 2023 came back positive for methamphetamine because she relapsed after S.D.G. was taken from her. When asked why S.D.G. would tell Department investigators that she saw her and B.B. smoking a pipe, Mother contended that she would only have smoked marijuana or tobacco in front of S.D.G.

Mother testified that she has six children, including S.D.G., and her parental rights were terminated to her other five children when she was living in California. Mother

5

explained that her parental rights to her first child were terminated because she entered a drug treatment program, and her rights to her second, third, fourth, and sixth children were subsequently terminated because "in California, once you have a kid removed from your custody, they . . . take all your kids that you have after that." Mother testified she exaggerated her drug use at the time of her first pregnancy to qualify for housing in the treatment program so that she could escape an abusive relationship. Mother admitted that her fourth child, born in California in 2011, tested positive for amphetamines and marijuana because she "self-medicated" and gave birth at home. Mother explained that she did not seek any prenatal care for any of her pregnancies: "I didn't seek any prenatal care when I was pregnant with any of my kids. Honestly, unless I'm dying or having a kid now that I have had C-sections, I don't believe in doctors." When asked if her sixth child, born after S.D.G. in California in 2017, tested positive at birth for syphilis, methamphetamine, and marijuana, Mother stated: "I don't know. Like I said, they took him at birth and that—that whole case was a mess, just like all my other cases." However, she believed any positive drug test may have been from "a soda . . . laced with methamphetamines" that she drank in Mexico prior to birth.[3]

The record indicates that S.D.G. was previously removed from Mother's custody upon birth because of admitted use of "methamphetamines throughout seven of the eight months during the pregnancy." At trial, however, Mother disputed the veracity of this account, contending, "That's not what I told them. That's a lie." S.D.G. was returned to Mother's custody about three months later, and she gained permanent managing

---

[3] There is some evidence in the record that Mother fled to Mexico to give birth to her sixth child to avoid Department intervention and termination of her parental rights.

conservatorship of S.D.G. about a year and a half later by completing a parenting class, attending all of her court dates, submitting to drug testing, and completing counseling sessions. She testified that she "never actually got a family plan of service" in that case and only complied with those requirements because they "were court-ordered" and her mother told her to "do whatever CPS wanted [her] to do."

Mother contended she did not know the family service plan was "court-ordered" in this case, and she was under the impression she did not have to complete the service plan to regain custody of S.D.G. She pointed to notations in the family service plan that stated that the requirements were not court-ordered. She then explained that she did not know the court adopted the family plan of service as an order in August 2022 because her phone died during the remote hearing. When she called back, she was instructed to talk to her lawyer or social worker. Mother testified that she fired her attorney prior to the hearing, and she was not talking to the social worker "because every time [she] had any contact with the social workers, they've turned around and lied about what [she] say[s]." As she explained:

> I don't deal with CPS because of all the lies and the cases—previous cases I have had. So, I would not—didn't want anything to do with it because every time I've talked to a social worker or an investigator, they have twisted my words around or lied and nobody's ever wanted to listen to anything that I've had to say and it's all just been—recorded all these lies. So, I just wasn't dealing with them.

Mother contended that she was not aware she was required to complete the plan until after a status hearing in August or September 2023. It was only after learning that the plan was mandatory that she began meeting with Ramos and working to complete the service plan.

7

Nevertheless, Mother testified that B.B. was completing the requirements of the plan, and she thought that B.B.'s participation would be enough for the couple to retain custody of S.D.G. According to Mother, California has a different termination process and she thought "as long as [B.B.] was doing what he had to . . . he still had his rights" and her rights could not be terminated. She intended to get her case into federal court while B.B. completed the service plan. However, according to Mother, after a court-ordered paternity test indicated that B.B. was not S.D.G.'s father, she "knew [she] had to step in" and participate "because this case was going to continue."

The trial court signed an order terminating Mother's parental rights pursuant to Texas Family Code § 161.001(b)(1)(D), (E), (N), and (M). *See id.* § 161.001(b)(1)(D), (E), (N), (M). The trial court further found that termination of Mother's parental rights was in S.D.G.'s best interests. *See id.* § 161.001(b)(2). This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

Mother does not contest the sufficiency of the evidence supporting the trial court's predicate findings under family code § 161.001(b)(1). *See id.* § 161.001(b)(1). Instead, she argues that the evidence was legally and factually insufficient to support the trial court's finding that termination was in S.D.G.'s best interest. *See id.* § 161.001(b)(2).

### A. Standard of Review & Applicable Law

"Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In parental termination cases, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the factfinder's role. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018)

8

(citing *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. In a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31 (citing *In re J.F.C.*, 96 S.W.3d at 266). Thus, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631 (citing *In re J.F.C.,* 96 S.W.3d at 266).

Factual sufficiency, on the other hand, requires us to weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* We "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)). Therefore, "[e]vidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. (citing *In re J.F.C.*, 96 S.W.3d at 266).

To terminate parental rights, a court must find two elements by clear and convincing evidence: (1) the parent committed one of the statutory grounds for termination found in § 161.001(b)(1) of the family code; and (2) termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Because of the fundamental rights at issue, due process requires that parental termination be supported by clear and convincing evidence. *In re S.M.R.*, 434 S.W.3d

9

576, 580 (Tex. 2014); *In re K.M.L.*, 443 S.W.3d at 112. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d at 264.

## B.    Best Interest Finding

There is a strong though rebuttable presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In reviewing a best interest finding, we consider, among other evidence, the non-exclusive *Holley* factors. *See In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* The party seeking termination is not required to prove all nine *Holley* factors, and in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 25, 27 (Tex. 2002).

## C.    Analysis

As to the first *Holley* factor, the child's desires, Mother argues that S.D.G. wants to return to her custody. Mother points to an August 2022 attorney ad litem status report

10

which reported that S.D.G. was "emotional and want[ed] to return home to her mother"; had a bad cough seemingly caused by excessive crying; "did not want to take her shoes off, bathe, eat or sleep"; and "was constantly packing up her things and trying to leave." The report stated that S.D.G. ran away from her foster home by "jumping out a window but was found five houses away." A November 2022 status report relayed that S.D.G. said "she would like to return home to her parents" and requested "that she have more in-person visits" with her parents. However, these reports also indicated that S.D.G. became "very upset after speaking with her mother" because Mother allegedly told S.D.G. "that the [family] dog was not eating since [S.D.G.] had been removed," and S.D.G. "does not like being on the virtual visits [with her parents] and frequently cuts the visits short."

Later status reports indicated that S.D.G. expressed a desire to live with her half-brother, D.G.M., and his adoptive parents in Alabama. The August 2023 status report stated that S.D.G. visited D.G.M. and his adoptive family, and she "was very happy," she said she wanted to stay with D.G.M. and his adoptive parents "forever," and she appeared to have bonded with her brother. The October 2023 report, the last report in the record, indicated that S.D.G. "did not want to return" to Texas and told the attorney ad litem to ask the judge to let her go back to her family in Alabama.

The evidence of this factor weighs neither in favor of nor against the court's best-interest finding. And "[a]lthough a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh" overwhelming or undisputed "evidence showing that the parents placed or allowed the child to remain in conditions, [or] engaged in conduct . . . which endangers the physical and emotional well-being of the child." *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—

11

Texarkana 2003, no pet.); *see In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied).

Relevant to the third, fourth, and seventh factors, the Department received reports that S.D.G. was "frequently going over to neighbors' homes asking for food," "was seen unsupervised quite often throughout the neighborhood," appeared malnourished, "demonstrated signs of food insecurity," and told investigators there was "a time when the family had no food stamps and were hungry for days and had nowhere to sleep." The Department alleged that S.D.G. could not read or write. The record shows that when she was enrolled in school, she was placed in a grade below her appropriate age level and was required to attend summer school. While Mother testified that she has the requisite materials to homeschool S.D.G., she provided no evidence or testimony that she was actually homeschooling S.D.G. or that she would be able to help S.D.G. keep up with her appropriate level of schooling.

The record shows that Mother has an extensive history with the Department. S.D.G. was the subject of four investigations for neglectful supervision, and she was removed from Mother's care upon birth due to Mother's admitted illegal drug use throughout her pregnancy. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." (citation omitted)); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (noting that the factfinder can give "great weight" to the "significant factor" of drug-related conduct by a parent). Mother admitted to using methamphetamine throughout her twenties and her parental rights to five other children were terminated due to drug use.

12

Despite evidence of domestic violence in the household and S.D.G.'s outcry about sexual abuse or attempted sexual abuse by B.B., Mother married B.B. And, as Ramos testified, the couple lived in a home that acted as a halfway house for individuals recently released from jail.

Mother largely denied these allegations at trial. In termination cases, it is the sole province of the factfinder to weigh the credibility of witnesses. *In re S.L.*, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (explaining that the factfinder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony")). Here, the trial court could reasonably conclude that Mother is unable to protect S.D.G. from current and future emotional and physical danger and lacks key parenting abilities and stability. *See In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied) ("Additionally, a child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in determining best interest." (citing *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.)); *see also* TEX. FAM. CODE ANN. § 263.307(a) (providing that, in considering whether parents are willing and able to provide a safe environment, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest").

A large portion of the Department's case at trial focused on Mother's failure to participate in material portions of the family plan of service. "Non-compliance with a service plan is probative of a child's best interest." *In re O.N.H.*, 401 S.W.3d 681, 687 (Tex. App.—San Antonio 2013, no pet.) (citing *In re W.C.*, 98 S.W.3d 753, 765 (Tex. App.—Fort Worth 2003, no pet.)); *see also In re M.S.L.*, No. 14-14-00382-CV, 2014 WL

13

5148157, at *17 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014) (mem. op.) ("The failure to comply with a service plan can support the trial court's best interest finding." (citing *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013)). Mother argues that her improvement and participation in the family plan of service for the last three months of the case weigh against the trial court's best interest finding. She argues that she did not initially complete the family plan of service due to miscommunication, and once she was aware it was court-ordered and B.B. was found to not be S.D.G.'s biological father, she consistently followed the service plan.

However, Mother testified that she refused to communicate or cooperate with the Department for an entire a year, which indicates an unwillingness and inability to provide S.D.G. with a safe environment. *See In re G.P.*, 503 S.W.3d 531, 533 (Tex. App.—Waco 2016, pet. denied) (noting that "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision" is a factor indicating "a parent's willingness and ability to provide the child with a safe environment"). Further, the trial court was free to disbelieve Mother's testimony that she did not know she had to follow the service plan to regain custody of S.D.G., particularly in light of her extensive history with the Department. *See In re S.L.*, 188 S.W.3d at 394. And, recent improvements made by a parent, even if significant, "do[] not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *see also In re K.D.C.*, No. 02-12-00092-CV, 2013 WL 5781474, at *16 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.) (concluding that a parent's "recent improvement alone is not sufficient to avoid termination of parental rights"). The trial court could have concluded

14

that Mother's recent participation in the service plan did not outweigh the evidence presented of neglect, inability to meet S.D.G.'s physical and emotional needs, and inability to protect S.D.G. from danger. *See In re J.O.A.*, 283 S.W.3d at 346; *Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.) (concluding that a parent's lack of motivation to learn how to improve parenting skills is evidence supporting the best interest determination); *see also In re K.D.C.*, 2013 WL 5781474, at *16.

Looking at all of the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in S.D.G.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See In re A.C.*, 560 S.W.3d at 631. We overrule Mother's first issue.

### III.   TEXAS FAMILY CODE § 263.4011

By her second issue, Mother argues that she is entitled to a new trial because the trial court did not render its final order within ninety days of the date the trial commenced pursuant to § 263.4011 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 263.4011.

Section 263.4011 of the Texas Family Code provides:

(a)   On timely commencement of the trial on the merits under Section 263.401, the court shall render a final order not later than the 90th day after the date the trial commences.

(b)   The 90-day period for rendering a final order under Subsection (a) is not tolled for any recess during the trial.

(c)   The court may extend the 90-day period under Subsection (a) for the period the court determines necessary if, after a hearing, the court finds good cause for the extension. If the court grants a good cause extension under this subsection, the court shall render a written order specifying:

15

> (1)     the grounds on which the extension is granted; and

> (2)     the length of the extension.

> (d)     *A party may file a mandamus proceeding if the court fails to render a final order within the time required by this section.*

*Id.* (emphasis added). The parties do not dispute that the trial court rendered its final order past the ninety-day deadline set by § 263.4011. *Id.* § 263.4011(a). The parties also do not dispute that the trial court did not issue an order extending the ninety-day period. *See id.* § 263.4011(c).

Some of our sister courts have addressed this same argument, i.e., whether reversal of the termination order is a proper remedy for failing to abide by the ninety-day requirement of § 263.4011(a). *See id.* § 263.4011(a); *see also D.D. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-24-00572-CV, 2024 WL 5081415, at *6 (Tex. App.—Austin Dec. 12, 2024, no pet. h.) (mem. op.); *In re O.S.*, No. 02-24-00295-CV, 2024 WL 4778360, at *5–6 (Tex. App.—Fort Worth Nov. 14, 2024, no pet. h.) (mem. op.); *In re T.D.*, No. 04-24-00185-CV, 2024 WL 4177965, at *7 (Tex. App.—San Antonio Sept. 13, 2024, no pet.) (mem. op.); *In re G.L.J.*, No. 05-23-01296-CV, 2024 WL 2513311, at *5 (Tex. App.—Dallas May 24, 2024, no pet.) (mem. op.). In these cases, appellants argued that the trial court's failure to comply with § 263.4011(a) deprived the court of jurisdiction to issue the termination order. *See D.D.*, 2024 WL 5081415, at *6; *In re O.S.*, 2024 WL 4778360, at *6 ("[M]other and Father seem to suggest that the trial court's purported failure to comply with [§] 263.4011 deprived it of jurisdiction to sign the termination order."); *In re G.L.J.*, 2024 WL 2513311, at *5.

However, each court concluded that the § 263.4011(a) deadline was not jurisdictional because subsection (d) clearly indicates that mandamus relief is the

16

appropriate remedy. *See D.D.*, 2024 WL 5081415, at *6 ("Thus, even if the trial court failed to enter an order within ninety days of trial commencing against Mother, her remedy would not have been dismissal but to seek mandamus relief requiring the trial court to enter an order."); *In re O.S.*, 2024 WL 4778360, at *7 ("[W]e hold that the remedy suggested by Mother and Father for a violation of [§] 263.4011—reversal of the termination order—is at odds with the specific remedy of mandamus contemplated by [§] 263.4011(d)."); *In re T.D.*, 2024 WL 4177965, at *8; *In re G.L.J.*, 2024 WL 2513311, at *5–6. As the Dallas court explained:

> By authorizing parties to "file a mandamus proceeding" in subsection (d), the Legislature contemplated that a court of appeals may enter an order directing the trial court to issue the final order that the trial court failed to enter within the time limit prescribed by subsection (a). It would make no sense for an appellate court to compel a trial court to enter an order that the trial court has no jurisdiction to enter. Thus, the Legislature's inclusion of subsection (d) is clear evidence that it did not intend for the deadline in subsection (a) to be jurisdictional.

*In re G.L.J.*, 2024 WL 2513311, at *6 (citations omitted).

Mother has provided no authority that reversing the termination order is a proper remedy under § 263.4011. For the reasons elucidated by our sister courts as set forth above, we conclude that the § 263.4011(a) deadline is not jurisdictional and the trial court's failure to comply with the deadline did not deprive it of jurisdiction to sign or render the final termination order. *See* TEX. FAM. CODE ANN. § 263.4011; *see also D.D.*, 2024 WL 5081415, at *6; *In re O.S.*, 2024 WL 4778360, at *7; *In re T.D.*, 2024 WL 4177965, at *8; *In re G.L.J.*, 2024 WL 2513311, at *5–6; *see also In re J.S.*, 670 S.W.3d 591, 599–605 (Tex. 2023) (distinguishing between "mandatory" and "jurisdictional" language in the

family code). Accordingly, Mother is not entitled to a new trial on this basis. We overrule

Mother's second issue.

## IV.    CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Delivered and filed on the
6th day of February, 2025.